**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

WALTER D. RASHAD,

              Plaintiff,

      v.

JETYD CORPORATION, et al.,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 11-08455 DMG (PJWx)

**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 18]**

      This matter is before the Court on the Motion for Summary Judgment filed by Defendants Jetyd Corp. and UNEX Corp. on July 26, 2013 [Doc. # 18]. The Court held a hearing on September 6, 2013. The Court has duly considered the arguments and evidence presented in support of and in opposition to the motion. For the reasons discussed below, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

**I.**

**PROCEDURAL HISTORY**

      On October 12, 2011, Plaintiff Walter D. Rashad filed a Complaint in this Court against Defendants Jetyd and UNEX. [Doc. # 1.] The Complaint raised the following

claims: (1) breach of contract; (2) fraud; (3) race discrimination in violation of the Unruh Civil Rights Act of California, Cal. Civ. Code § 51; and (4) violation of 42 U.S.C. § 1981. Defendants filed an Answer on December 19, 2011. [Doc. # 6.] On July 26, 2013, Defendants filed the instant Motion.

## II.

## FACTUAL BACKGROUND

**A.**   **Evidentiary Disputes**

   **1.**   **Objections to the Declarations of Reed Grover and Eralp Sement**

Plaintiff submits the declarations of Reed Grover and Eralp Sement, two former employees of TorcUP who claim to have witnessed John Kovacs making racist statements generally and about Plaintiff specifically. [Doc. ## 22-7, 22-12.] Defendants request that the Court strike both declarations because Plaintiff failed to disclose either witness in his Initial Disclosures under Fed. R. Civ. P. 26 or in his responses to interrogatories on July 13, 2012. (*See* Suppl. Decl. of Brendan Y. Joy ¶¶ 2, 6, 11, Exs. 1, 3, 5 [Doc. # 25-2].)

A party who fails to make the required initial disclosure "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial," except where the failure to comply was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1); *Hoffman v. Constr. Protective Serv., Inc.*, 541 F.3d 1175, 1179 (9th Cir.2008). The purpose of this sanction is to prevent the prejudice to the opposing party that results from the lack of opportunity to depose a witness. *See Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (failure to disclose witness created "obvious prejudice" because opposing party prepared expert reports without knowing the scope of undisclosed witness' opinions).

On August 30, 2013, Plaintiff filed responses to Defendants' objections. [Doc. ## 30-32.] Plaintiff states that he disclosed his intent to depose Sement as a witness in an email to Defense counsel on May 23, 2013, prior to the July 19, 2013 discovery cut-off date. (Suppl. Decl. of Alvin Pittman ¶ 2, Ex. A [Doc. # 29].) Plaintiff further states that

he did not learn that Grover might be a potential witness until he interviewed Sement in preparation for filing his Opposition. (*Id.* ¶ 4.) Thus, although Plaintiff did not disclose Sement in his initial disclosures or responses to interrogatories, Defendants were on notice of his intent to use Sement as a witness prior to the filing of their motion. Additionally, as Plaintiff did not discover Grover until recently, his failure to disclose is substantially justified. *See* Fed. R. Civ. P. 37(c)(1). Moreover, any prejudice to Defendants can be ameliorated by allowing them the opportunity to depose Sement and Grover prior to trial. Accordingly, the Court declines to strike the declarations at this time, but it will extend the discovery cut-off date to allow Defendants an opportunity to depose these witnesses.

### 2. <u>Other Evidentiary Objections</u>

Plaintiff objects to much of the Declaration of Eric Junkers and attached Exhibits on the basis that Junkers does not establish that he was President of Jetyd or UNEX during the relevant period, and thus that he cannot authenticate or lay a proper foundation for any of his assertions or evidence about the nature and circumstances of Plaintiff's Agreement with Jetyd. (*See* Junkers Decl.; Pl.'s Obj. to Junkers Decl. [Doc. # 24].) The Court agrees that the Junkers Declaration does not establish that Junkers was President during the relevant period, as it states only that Junkers is the *current* President of Jetyd and UNEX. (Junkers Decl. ¶ 2.) As the question of Jetyd's leadership during the relevant period appears to be a fundamental dispute of fact between the parties, the Court does not accept as true Junkers' representations as established facts except where they are not disputed by Plaintiff. Rather, it describes those facts only to demonstrate the dispute. Furthermore, the Court does not accept the truth of Junkers' statements as to the nature of Plaintiff's contract and performance except where they are not disputed by Plaintiff.

Plaintiff also objects to many of the facts in the Junkers Declaration as hearsay. Some of the objections appear to be well founded. For example, Junkers makes the following assertion: "When the quotations failed to result in orders, **we** approached Plaintiff and asked if he would like assistance in trying to close some of the sales."

(Junkers Decl. ¶ 21.) It is unclear from the declaration whether Junkers did the asking or another person did so. It is not necessary, however, to address each of Plaintiff's hearsay objections in detail. As indicated above, to the extent Plaintiff's objections are based on the fact that Junkers was not President of Jetyd or UNEX at the relevant period and therefore his statements are not properly authenticated, *see* Fed. R. Evid. 901(b)(1), the Court does not accept Junkers' statements as true but references them only for the purpose of describing the factual disputes.

Defendants similarly object to certain statements in the Rashad Declaration that were allegedly made by Mike Dolan, Rick Thornton, Charlie Fuqua, and John Junkers.[1] As discussed below, all of these individuals are agents or employees of either Jetyd or UNEX and the statements are within the scope of their employment. Therefore, their out-of-court statements are not hearsay under Fed. R. Evid. 801(d)(2)(D). Moreover, to the extent the facts are disputed, the Court does not accept the facts as true but describes them only to show the dispute.

The Court addresses any remaining objections as necessary throughout this order.

### 3. Defendants' Challenge to Plaintiff's "New" Theories

In his Opposition, Plaintiff raises new facts and theories to show that Defendants discriminated against him on the basis of race. Specifically, for the first time, Plaintiff asserts that Kovacs was President of Jetyd and an overt racist, and he hired Plaintiff only to obtain his business contacts and never intended to keep Plaintiff on as a distributor. (Rashad Decl. ¶ 6; Sement Decl. ¶ 6.) Defendant contends that this theory is inconsistent with the theory Plaintiff advanced during his initial disclosures, which was based on his belief that his contract was canceled after the Junkers family discovered his race. (*See*

---

[1] Mike Dolan is Jetyd's Chief Engineer and has worked for Jetyd since at least December 2009. (Decl. of Mike Dolan ¶ 2 [Doc. # 26-5].) During the relevant period, Rick Thornton was Jetyd's Chief Operations Officer, and Charlie Fuqua was Jetyd's National Sales Manager. (Pl.'s Additional Statement of Uncontroverted Facts ¶¶ 65-66 ("PSUF") [Doc. # 22].) Thornton and Fuqua are no longer with Jetyd. (Dolan Decl. ¶ 8.)

Suppl. Joy Decl. ¶¶6, 11, Exs. 3, 5.)  Plaintiff also did not advance this theory at his deposition on May 28, 2013.  (*See* Joy Decl. ¶ 3, Ex. I ("Rashad Depo.") at 34:3-4 [Doc. # 18-13].)

A party may generally not circumvent Rule 8's pleading requirements by asserting new allegations in response to a motion for summary judgment.  *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (plaintiff's addition of new alleged violations of Americans with Disabilities Act ("ADA") in opposition to summary judgment did not defeat motion because the complaint did not put defendants on notice of these additional claims).  Similarly, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (deponent who claimed to remember almost nothing about the central events could not later submit an affidavit describing events in detail without credible explanation as to how his memory was refreshed).

Here, the crux of Plaintiff's claims is that Jetyd had a policy of racism against African-American distributors and as a result his Agreement was not renewed notwithstanding his strong performance under the Agreement.  This theory has not changed since the case's inception, only the facts supporting that theory have.  From the case's inception, Defendants have been on notice of the contours of Plaintiff's claims arising out of his allegedly discriminatory treatment.  *But see Pickern*, 457 F.3d at 468 (where initial pleading alleged only the failure to provide a ramp, plaintiff could not raise facts as to other, independent barriers to access that were not alleged in complaint).  Moreover, although the Rashad, Sement, and Grover Declarations advance new facts not previously mentioned in Plaintiff's initial disclosures, these new facts are not necessarily contradictory.  Plaintiff still maintains that Eric Junkers communicated the decision not to renew Plaintiff's contract to Fuqua, who in turn notified Plaintiff.[2]  (Rashad Decl. ¶ 34.)

---

[2] In this sense, Plaintiff's new facts are distinguishable from the situation in the cases cited by Defendants.  In *Pickern*, the plaintiff sought to add facts about alleged barriers to access wholly distinct from the barriers alleged in the original complaint, in effect adding new and independent claims under the ADA.  457 F.3d at 968-69.  In *Ward v. Clark Cnty.*, 285 Fed. App'x 412 (9th Cir. 1983), the plaintiff

In employment discrimination cases, plaintiffs are generally not required to put forth exhaustive facts in their pleadings. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (plaintiff is not required to establish a *prima facie* case of discrimination in complaint because he may not have access to all necessary facts prior to discovery); *see also Anderson v. MCM Const. Inc.*, Case No. 10-02833, 2012 WL 6571034, at *5 (E.D. Cal. Dec. 17, 2012) (harmonizing *Swierkiewicz* with *Twombly-Iqbal* pleading standard and holding that a plaintiff is still not required to plead a *prima facie* case of discrimination). Moreover, the Ninth Circuit has recognized that "an employer's true motivations are particularly difficult to ascertain . . . thereby making such factual determinations generally unsuitable for disposition at the summary judgment stage." *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 732-33 (9th Cir. 1986) (citing *United States Postal Serv. Bd. Of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983)). Finally, as discussed above, any prejudice to Defendants arising from the inability to depose witnesses is easily remedied by extension of the discovery cut-off date. Accordingly, the Court declines to strike or disregard Plaintiffs' evidence at this time.

**B.    Undisputed Facts**

The following facts are undisputed:

Plaintiff is an African-American man. (Def. Separate Statement of Uncontroverted Facts ("DSUF") ¶ 1 [Doc. # 18-2].) On September 28, 2009, Plaintiff signed a distribution agreement ("Agreement") with Jetyd to serve as a Distributor of Jetyd's products. (*Id.*; Decl. of Eric Junkers ¶ 5, Ex. A [Doc. # 18-4].) When Plaintiff was hired, no one at Jetyd had met him in person—he was hired after several telephone interviews

---

sought to add a new act of retaliation based on acts the defendant engaged in *after the filing of the complaint*. Thus, in both cases, the new alleged facts essentially added independent claims to the preexisting complaint. In contrast, here, Plaintiff's claims and essential facts remain the same, but the actors and their motives have developed. That is a normal byproduct of the discovery process, especially in cases in which alleged discriminatory motives are at issue.

with Rick Thornton, Jetyd's Chief Operations Officer, and Charlie Fuqua, Jetyd's National Sales Manager. (Pl.'s Additional Statement of Uncontroverted Facts ¶¶ 65-66 ("PSUF") [Doc. # 22].)

The first paragraph of the Agreement states:

> The AGREEMENT is made between the Parties JETYD, with its head office located at 120 Wesley Street, South Hackensack, NJ 07606, U.S.A. (hereinafter called COMPANY) [illegible] <u>Rashad</u> hereinafter called (DISTRIBUTOR), residing at <u>4804 Don Mavel</u> for the Region of <u>LA</u> (hereinafter called TERRITORY.)

(Junkers Decl. ¶ 5, Ex. A; emphasis added.) Plaintiff's name and address are handwritten, as is the abbreviation "LA" which the parties agree means "Los Angeles." (*See* Rashad Depo. at 34:3-4.) Plaintiff's initials appear next to "LA," indicating that he wrote and agreed to the use of that term. (*Id.* at 34:10-15.)

The Agreement also contains an integration clause, which states that "there is no obligation other than what is outlined herein by either DISTRIBUTOR or COMPANY." (Junkers Decl. ¶ 5, Ex. A.) The Agreement provides that, after an initial 90-day grace period, Jetyd could cancel the Agreement only after sending Plaintiff a written cancellation notice of "deficiencies" and giving him 30 days to correct. (*Id.*) Such notice was not required if Plaintiff was arrested, failed to comply with Jetyd's policies, or committed fraud. Otherwise, the Agreement provided:

> This AGREEMENT will renew upon evaluation each year. The following year's annual sales requirement will be established by review of the territory sales results and agreement between the COMPANY and the DISTRIBUTOR in December of the following year. It is at the discretion of Jetyd to renew or cancel the contract each year.

(*Id.*)

The Agreement provides that Plaintiff is "expected" to bring in a "monthly minimum for [his] territory of $30,000." (Junkers Decl. ¶ 5, Ex. A.) In order to earn a

commission, Plaintiff was required to obtain a "legitimate, written, customer purchase order." (*Id.*) A "sale" is defined as "a legitimate end-user order at US List Pricing received by the COMPANY, accepted, shipped, and invoiced by the COMPANY and paid for by the end-user in full." (*Id.*) The Agreement further contained the following language regarding calculation of commission:

**INTRODUCTORY COMMISSION SCHEDULE (Max 6 Month Period)**

$3000 Monthly Draw Against Commission for up to six (6) months.

20% Commission Paid Upon Reaching $15,000.00 In Sales Monthly

**STANDARD COMMISSION SCHEDULE (Post Introduction Period)**

15% Commission Paid For All Sales Below Monthly Quota

20% Commission Paid For All Sales Upon Reaching Monthly Quota

(*Id.*)[3]

Plaintiff received a commission of $1310.22 for a sale of $6551.00 to a company called Rio Tinto. (DSUF ¶ 34.) A second order, for $33,525.00 from a company called Flowserve, was canceled and did not result in any commission. (*Id.* ¶ 35.) The circumstances of that cancellation are disputed but not material.

Plaintiff received monthly $3000.00 draws on commission between October 2009 and July 2010. (*Id.* ¶ 42.) In July 2010, he met Eric Junkers, President of both Jetyd and UNEX, for the first time. (PSUF ¶ 67.) Junkers increased Plaintiff's draw amount to $5000 per month. (*Id.* ¶ 48; Junkers Decl. ¶ 2.) Between September 2009 and October 18, 2010, Plaintiff received $42,000 in draw payments.[4] (SUF ¶ 45.)

---

[3] Plaintiff purports to dispute these facts by arguing that the Agreement is silent as to the commission terms of the Agreement. The plain language of the Agreement indicates that these terms were set out clearly and are thus not subject to reasonable dispute.

[4] Plaintiff purports to dispute this fact, arguing that the "term" of his Agreement was from January to December 2010, and during that time he was paid $33,000 in draws on commission. Plaintiff does not dispute that he also received $3000 per month from September to December 2009, and thus that the total draws he received amount to $42,000.

-8-

On October 18, 2010, Fuqua sent Plaintiff an email informing him that his association with Jetyd was terminated, effective immediately. (Junkers Decl. ¶ 29, Ex. F.) The agreements of three other distributors who performed services for Jetyd during Plaintiff's term, all of whom were Caucasian, were not renewed. (DSUF ¶ 50.) These distributors all had sales figures lower than Plaintiff's. (*Id.* ¶ 50.)

**C.   Disputes Regarding Defendants' Corporate Relationship**

Jetyd, UNEX, and three other companies—TorcUp, Hytorc, and TorcGun—are all owned by the Junkers family.[5] (PSUF ¶ 67.) Plaintiff attests that, after his hire, he learned that UNEX was the "parent company" for the other four companies. (Rashad Decl. ¶ 10.) Plaintiff claims that he was paid by UNEX throughout his tenure with Jetyd.[6] (*Id.* ¶ 11.) According to Junkers, UNEX and Jetyd are "separate corporate entities with separate employees and separate product lines." (Junkers Decl. ¶ 4.) John Junkers, Eric Junkers' brother, is the Chief Executive Officer of UNEX. (*Id.* ¶ 26.)

**D.   Disputes Regarding Plaintiff's Sales**

The parties dispute the extent of Plaintiff's sales success during his tenure as a distributor for Jetyd.

### 1.   Plaintiff's Account

According to Plaintiff, Fuqua told Plaintiff during interviews that his territory would be "Central and Southern California, excluding San Diego [sic], but including the San Onofre Nuclear plant" ("San Onofre Plant"), because Plaintiff had a pre-existing relationship with Southern California Edison ("SCE"), which owned the Plant. (Decl. of Walter Rashad ¶ 7 [Doc. # 22-1].) When Plaintiff signed the Agreement, he understood

---

[5] Defendants maintain that this fact is not material, but they do not dispute it. (Def. Reply to PSUF ¶ 72 [Doc. # 25-1].)

[6] Defendants maintain that this fact is not material, but they do not dispute it. (Def. Reply to PSUF ¶ 73.)

that his "territory" included the San Onofre Plant.[7]  (*See* Rashad Decl. ¶ 7.)  This understanding was confirmed at a training meeting on November 3, 2009 with Fuqua, Thornton, and San Diego Representative Glenn Karp, at which Plaintiff was assigned the San Onofre Plant and Karp received the rest of the San Diego region.  (*Id.* ¶¶ 17-20.)  Plaintiff attests that, in his experience, relationships in the industry tend to require six months to one year to develop actual sales.  (*Id.* ¶ 26.)

During the course of his contract, Plaintiff sent in "over 60 quotations amounting to over three (3) million dollars."  (Rashad Decl. ¶ 43.)  Jetyd never offered to help Plaintiff close any deals, although Plaintiff was denied assistance when he requested help to close a deal at some point.[8]  (*Id.* ¶ 44.)  In February 2010, Fuqua told Plaintiff that there was a "lead" at the San Onofre Plant "that could be worth millions," and instructed Plaintiff to "get right on it."  (*Id.* ¶ 24.)  Fuqua gave Plaintiff the contact information for Fred Simma, the SCE contact person, and Plaintiff called Simma and thereafter was the "lead" on the San Onofre Project.  (*Id.* ¶ 25.)  Around September 2010, Fuqua informed Plaintiff that SCE had submitted a purchase order for $600,000, and that Plaintiff would receive a commission of $120,000 for that sale.  (*Id.* ¶ 32-33.)  Plaintiff never received that commission despite repeated requests by both Plaintiff and Fuqua.  (Compl. ¶ 34.)

## 2.  **Defendants' Account**

According to Junkers, Plaintiff provided services as an independent contractor to Jetyd only, not to UNEX.[9]  (Junkers Decl. ¶ 6.)  During the course of his contract,

---

[7] In his deposition, Rashad acknowledged that the Agreement itself does not indicate that his territory included the San Onofre Plant.  (Rashad Depo at 34:6-15.)  He maintained, however, that he had agreed with Fuqua and others, both before and after signing, that his territory included the Plant.  (*Id.* at 34:17; 36:25-37:20.)

[8] In his Complaint, Plaintiff states the contrary fact that "John and Eric Junkers offered their assistance if Plaintiff needed them to assist with closing deals" in July 2010.  (Compl. ¶ 26.)

[9] Plaintiff objects to this statement as vague as to time and lacking foundation because the evidence does not establish that Junkers was President of Jetyd during the relevant period.  The Court agrees that the Junkers Declaration does not establish that Junkers was President during the relevant period, as it states only that Junkers is the current President of Jetyd and UNEX.  (Junkers Decl. ¶ 2.)

-10-

Plaintiff sent in 22 customer quotations for prospective sales totaling $852,267.20. (*Id.* ¶ 20.) Only one of these quotations, the Rio Tinto quotation, resulted in a sale. (*Id.* ¶ 21.) Plaintiff refused offers to help him close sales. (*Id.* ¶ 28.)

Junkers attests that Glenn Karp was the distributor responsible for the San Diego region, including the San Onofre Plant, until December 2009, when he left Jetyd and was replaced by Russ Zorn. (Junkers Decl. ¶ 23-24; Dolan Decl. ¶ 5.) Zorn earned the commission on the San Onofre Plant sale. (*Id.* ¶ 23.) According to Simma, SCE's contact at Jetyd was Russ Zorn, not Plaintiff. (Decl. of Fred Simma ¶ 5.) Simma does not recall ever meeting Plaintiff. (*Id.*) Simma recalls receiving three "unsolicited emails" from Plaintiff in June 2010, August 2010, and July 2011, but none of these emails pertained to the San Onofre Plant Project. (*Id.*) According to Dolan, Plaintiff was never assigned the San Onofre Plant and is not owed a commission on that sale. (Dolan Decl. ¶ 6.) Dolan states that Plaintiff was "kept apprised of developments on the project . . . because [Jetyd] wanted other sales from [SCE]." (*Id.* ¶ 8.) Jetyd wanted Plaintiff to build contacts so that "he could make sales in his territory." (*Id.*)

## D. Disputes Regarding the Circumstances of Plaintiff's Employment and Termination

### 1. Plaintiffs' Account

Plaintiff asserts that he was hired because of his "extensive knowledge of, and contacts within the Oil and Power industries," and his former employment with SCE. (Rashad Decl. ¶ 4.) According to Plaintiff, Thornton, Dolan, and Fuqua consistently lauded his performance throughout his tenure with Jetyd. (Compl. ¶¶ 36-37; Rashad Decl. ¶¶ 16, 29.)

After he was hired, Plaintiff learned from Fuqua that he was "receiving the lowest

---

Many of Plaintiff's other objections to the Junkers Declaration are based on this dispute of fact. The Court does not accept the representations of Junkers as to the nature of Plaintiff's contract and performance except where they are not disputed by Plaintiff.

draw [on commission] by far" out of all of the distributors. (Rashad Decl. ¶ 16.) For example, a distributor named Terry Quinn was allegedly receiving $10,000 to $13,000 per month "despite having made no sales." (*Id.* ¶ 30.) None of these higher-earning distributors were African-American. (*Id.*)

Plaintiff asserts that John Kovacs was President of Jetyd during the course of his employment relationship with Jetyd. (Rashad Decl. ¶ 12.) Sement and Grover also attest that Kovacs "held himself out as President of . . . Jetyd" from at least 2007 until 2012. (Sement Decl. ¶ 3; Grover Decl. ¶ 3.) Kovacs never met Plaintiff before he was hired. (Rashad Decl. ¶ 6.) According to Sement, a former employee of TorcUp who had a close working relationship with Kovacs, Kovacs insisted on a policy against hiring African-American applicants, against whom he used racial slurs about "95% of the time." (Sement Decl. ¶ 5.) Kovacs was also racist and discriminatory against other ethnic minorities and women. (*Id.*) Kovacs allegedly referred to Plaintiff as "a Nigger in Los Angeles who is supposed to have lots of contacts that [Jetyd] can use to make sales." (*Id.* ¶ 6.) Kovacs told Sement that Plaintiff "is married to a judge and we want his contacts," and he referred to Plaintiff as a "dead man walking when he was hired." (*Id.* ¶¶ 6, 18.) Kovacs also made statements like, "The King has made it clear that we will not have any Niggers working out in the field representing the Company," and he expressed reservations about sending African-Americans to meet with potential customers in the South in particular. (*Id.* ¶ 12.) Grover, who is also a former employee of TorcUp, conveys a similar account of his conversations with Kovacs during his more than 10 years at TorcUp until 2012. (*See* Grover Decl. ¶ 1.)

After Plaintiff's contract was terminated in October 2010, Fuqua informed Plaintiff that he had been terminated at the direction of Junkers. (Rashad Decl. ¶ 34.) Fuqua had told Junkers about the $600,000 sale and Plaintiff's other successes, but he believed that Plaintiff's race was "a part of the driving force behind [Junkers] insistence" that he be terminated. (*Id.* ¶ 35.) Junkers allegedly told Fuqua, "[Plaintiff] does not fit our image." (*Id.*)

## 2. **Defendants' Account**

First, Defendants assert that Eric Junkers is the current President of both Jetyd and UNEX. (Junkers Decl. ¶ 2.) According to Junkers, "there is utterly no relationship between TorcUp and UNEX (HYTORC) and JETYD, other than that TorcUp is owned by a Junkers family trust." (Suppl. Junkers Decl. ¶ 2 [Doc. # 26].) Kovacs attests that he has been President of TorcUp since 1996. (Decl. of John Kovacs ¶ 2 [Doc. # 26-3].) From early 2007 to July 31, 2009, Kovacs ran Jetyd. (*Id.* ¶ 3.) Defendants submit Jetyd's payroll records for July and August 2009 demonstrating that Kovacs was removed from Jetyd's payroll as of July 31, 2009. (Suppl. Junkers Decl. ¶ 3, Ex. A.) Because these records end in July 2009, they do not show that Kovacs was not employed by Jetyd from September 2009 through October 2010 during the term of Plaintiff's contract. According to Defendants, in the middle of 2009, Junkers took over control of Jetyd and Rick Thornton was hired as Chief Operating Officer. (*Id.* ¶ 3, Ex. B.) Kovacs denies that he has ever met Rashad and states that he had never even heard of Rashad until after initiation of this lawsuit. (Kovacs Decl. ¶ 4.) He attests that he was never consulted about Rashad's contract, including whether to cancel or renew it, and he never implied or stated that Rashad was hired so that his contacts could be stolen. (*Id.*) Kovacs denies the allegations in the Sement and Grover Declarations. (*Id.* ¶ 5.)

According to Junkers, Terry Quinn received a $3000 draw on commission when he started with Jetyd, but his draw was eventually raised to $10,000 because "he was selling product and [Jetyd] believed that he was a very promising salesman." (Junkers Decl. ¶ 31.) The "vast majority" of distributors receive only the baseline $3000 monthly draw. (*Id.*) According to Junkers, only three distributors—all of whom were Caucasian—achieved fewer sales than Plaintiff during the relevant period, and none of them were asked to remain with Jetyd. (Junkers Decl. ¶ 30.)

# III.

## STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e) (1986)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

# IV.

## DISCUSSION

Defendants move for summary judgment on each of the four causes of action in Plaintiff's Complaint. The Court addresses each cause of action in turn.

## A. Breach of Contract

The elements of a cause of action for breach of contract are: (1) the existence of a contract; (2) the plaintiff's performance or excuse for nonperformance; (3) breach; and

(4) resulting damages. *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821, 124 Cal. Rptr. 3d 256 (2011). Where the terms of a contract are "clear and unambiguous," interpretation is a question of law and summary judgment is appropriate, "even if the parties disagree as to their meaning." *Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 491 (9th Cir. 2000). "When the meaning of an agreement is ambiguous on its face and contrary inferences as to intent are possible, an issue of material fact exists for which summary judgment ordinarily is inappropriate." *Int'l Broth. Of Elec. Workers, AFL-CIO Local 47 v. S. Cal. Edison Co.*, 880 F.2d 104, 107 (9th Cir. 1989). A contract term is ambiguous when it is "susceptible of more than one reasonable interpretation." *Minkler v. Safeco Ins. Co of Am.*, 49 Cal. 4th 315, 321, 110 Cal. Rptr. 3d 612 (2010).

First, Plaintiff's breach of contract claim is against both Jetyd and UNEX. In their Motion, Defendants assert that Plaintiff's relationship was with Jetyd only and that therefore no contract existed between Plaintiff and UNEX. The Court agrees. The Agreement never refers to UNEX and is signed only by Plaintiff and an authorized representative of Jetyd. (Junkers Decl. ¶ 5, Ex. A.) The Complaint states no facts to suggest that UNEX was impliedly bound by the Agreement, except perhaps the allegation that "UNEX and Jetyd Corporations have common ownership/management and control." (Compl. ¶ 57.) In Opposition to the Motion, Plaintiff does not argue that UNEX was bound by the Agreement, and the only evidence of his relationship with UNEX is his assertion that UNEX paid him. (Rashad Decl. ¶ 11.) Plaintiff offers no authority, and the Court can find none, that these facts, if assumed true, would impose contractual obligations on UNEX under the Agreement. *See Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226, 1239 (C.D. Cal. 2007) (in labor context, parent corporation is not deemed joint-employer with subsidiary corporation because "corporate entities are presumed to have separate existences, and the corporate form will be disregarded only when the ends of justice require this result") (quoting *Laird v. Capital Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 737, 80 Cal. Rptr. 2d 454 (1998)). Because there is no material dispute that UNEX

was not bound under the Agreement, summary judgment is **GRANTED** as to Plaintiff's breach of contract claim against UNEX.

Defendants next assert that Jetyd could not have breached the Agreement because the Agreement expressly permits Jetyd to "renew or cancel the contract each year" at its discretion. (Junkers Decl. ¶ 5, Ex. A.) Thus, because Jetyd canceled the Agreement within a reasonable period after the end of one year (on September 28, 2010), it did so pursuant to its discretion under the Agreement.

Page One of the Agreement refers to "calendar years," for which the parties would agree upon the expected yearly sales quota. The renewal clause states that the Agreement would "renew upon evaluation each year," and it further states that "the following year's annual sales requirement will be established by review of the sales results and agreement between the COMPANY and the DISTRIBUTOR *in December of the following year*." (*Id.*; emphasis added.) It is unclear from this term whether Jetyd's discretion to renew or cancel the Agreement arose at the end of each calendar year or the end of 12 months from the signing of the Agreement. Plaintiff asserts that he understood the Agreement to permit Jetyd to cancel the contract in its discretion only in December, and that at all other times Jetyd was required to give 30 days' notice. (Rashad Decl. ¶ 44.)

Given the intermittent use of the terms "year" and "calendar year," and the reference to the mandatory 30-day cancellation notice, the Court agrees that the Agreement is somewhat ambiguous as to when Jetyd's discretionary authority arose, and both parties have presented evidence of their subjective understanding of the terms. *See Minkler*, 49 Cal. 4th at 321. Moreover, even under Defendants' theory, their decision to renew or cancel the contract should have occurred by September 28, 2010, not one month later. Thus, construing the facts in the light most favorable to Plaintiff, a material dispute, at the very least, exists as to the meaning of the renewal term and therefore summary judgment is inappropriate as to Plaintiff's claim for breach of contract.

**B.    Fraud**

To establish a claim for deceit based on either intentional misrepresentation or fraudulent concealment, a plaintiff must prove (1) a misrepresentation or concealment; (2) with knowledge of its falsity; (3) with intent to defraud; (4) justifiable reliance; and (5) resulting damage. *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 990, 22 Cal. Rptr. 3d 352 (2004); *Ragland v. U.S. Bank Nat'l Ass'n*, 209 Cal. App. 4th 182, 199-200 (2012).

Although fraud claims are often duplicative of claims for breach of contract, California courts allow concurrent contract and tort claims under the theory of promissory fraud, or "a promise to do something . . . without such intention." *Agosta v. Astor*, 120 Cal. App. 4th 596, 603, 15 Cal. Rptr. 3d 565, 569 (2004). An action for promissory fraud may lie "where a defendant fraudulently induces the plaintiff to enter into a contract." *Id.* (citing *Lazar v. Sup. Ct.*, 12 Cal. 4th 631, 638, 49 Cal. Rptr. 2d 377 (1996)). Recovery, however, may be limited by the rule against double recovery of tort and contract damages. *Id.*

As with his claim for breach of contract, Plaintiff adduces no evidence to suggest that UNEX made any misrepresentation that induced Plaintiff to enter into a contract, but for his own belief that UNEX never intended to pay his commissions. (Rashad Depo. at 208:12-17.) Moreover, Plaintiff attests that he communicated with Fuqua and Thornton, both of whom were acting on behalf of Jetyd, not UNEX, prior to entering into the Agreement. (Rashad Decl. ¶ 2.) Thus, the evidence does not show that UNEX made any misrepresentation to Plaintiff, either to induce him to enter into the contract or otherwise. Accordingly, summary judgment is **GRANTED** as to Plaintiff's fraud claim against UNEX.

As to Jetyd, Plaintiff adduces evidence that Kovacs, who Plaintiff asserts was President of Jetyd at the time, referred to Plaintiff as a "dead man walking when he was hired." (Sement Decl. ¶ 18.) Kovacs allegedly approved Plaintiff's hire in order to obtain Plaintiff's contacts, but he never intended to keep Plaintiff on as a distributor. (*Id.*

¶ 6.)  If this is true, then there exists a material dispute as to whether representations made to Plaintiff prior to the Agreement were made with the intent to induce him to enter into the Agreement, notwithstanding that Jetyd never intended to perform.

Defendants assert that any pre-Agreement statements made by Fuqua and/or Thornton are inadmissible under the parol evidence rule.  *See* Cal. Civ. Proc. Code § 1856(a).  Section 1856(a) does not exclude "other evidence of the circumstances under which the agreement was made or to which it relates . . . or to explain extrinsic ambiguity . . . or to establish illegality or fraud."  Cal. Civ. Proc. Code § 1856(g).  The California Supreme Court recently affirmed the longstanding principle that the parol evidence rule may not be "used as a shield to prevent the proof of fraud," overruling previous case law that had applied the rule in cases of promissory fraud.  *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1182 (2013) (quoting *Ferguson v. Koch*, 204 Cal. 342, 347, 268 P. 342 (1928)).  Thus, even if the statements made by Fuqua and Thornton prior to the Agreement are inconsistent with the plain language of the Agreement, they are admissible to prove that Jetyd fraudulently induced Plaintiff to enter into the Agreement despite its intent not to pay Plaintiff's commissions.

Because a triable issue of fact exists as to whether Jetyd made misrepresentations to Plaintiff with intent to induce him to enter into the Agreement, summary judgment is **DENIED** as to Plaintiff's fraud claim against Jetyd.

## C.  Violation of Unruh Civil Rights Act, Cal. Civ. Code § 51

Cal. Civ. Code § 51 protects individuals in California from discrimination on account of, among other grounds, race, and it entitles individuals to "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  The California Supreme Court has "expressly held that employment discrimination claims are excluded from § 51's protection." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1124 (9th Cir. 2008) (citing *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 500, 86 Cal. Rptr. 88 (1970)).  Relief under Section 51 is available, however, "when the plaintiff was in a relationship with the

offending business establishment 'similar to that of the customer in the customer-proprietor relationship.'" *Id.* (quoting *Strother v. S. Cal. Permanente Medical Gp.*, 79 F.3d 859, 874 (9th Cir. 1996)).

In *Alch v. Sup. Ct.*, 122 Cal. App. 4th 339, 393, 19 Cal. Rptr. 3d 29 (2004), the California Court of Appeal distinguished claims covered by the Unruh Act from employment claims not covered by the Act:

> In an employer-employee or any comparable relationship, the money flows from the employee or comparable entity to the employee or independent contractor. In the relationship between a business establishment and its 'clients, patrons, or customers,' the money flows in the opposite direction, from the client to the business establishment.

In *Johnson*, the plaintiff worked as a physician at the defendant hospital. 534 F.3d at 1119. Although he was technically a "contractor," the hospital paid him a nominal monthly sum to be on call and compensated him for each patient he treated. *Id.* at 1125-26. The court found that the relationship was an employer-employee relationship and held that his Unruh claim thus failed. In contrast, in *Payne v. Anaheim Mem. Med. Ctr., Inc.*, 130 Cal. App. 4th 729, 748, 30 Cal. Rptr. 230 (2005), the plaintiff physician did not work for the defendant hospital, was not compensated for his medical services by the hospital, and had no obligation to treat his patients there. The hospital exercised no "direct control" over the plaintiff's medical practice, but merely provided a facility for the plaintiff to conduct his medical work. *Id.* Thus, in *Payne*, the court concluded that the relationship was not one of employment.

Here, Plaintiff argues that the compensation he received—the "draws" on commission and commission itself—is not "compensation like an employee would receive; it is equivalent to a loan on anticipated commissions," and therefore the relationship is not one of employment as contemplated by the Unruh Act. (Opp'n at 20.) The Court disagrees. The undisputed facts show that Plaintiff had a contract with Jetyd in which Plaintiff agreed to sell Jetyd's products on behalf of Jetyd in exchange for

payment of commission. (Junkers Decl. ¶ 5, Ex. A.) Although Jetyd did not control all of Plaintiff's daily activities, the Agreement set forth the conditions under which Plaintiff could receive payment of a commission, gave Plaintiff the right to terminate the relationship at any time, and gave Jetyd the right to terminate under specified terms if Plaintiff failed to adequately perform. (*Id.*) Even if the draws on commission can be considered a "loan on anticipated commissions," the commissions themselves are a form of compensation for Plaintiff's successful sale of Jetyd's products, making the draws similar to advance payments. *See Alch*, 122 Cal. App. 4th at 393. Thus, Plaintiff's relationship with Jetyd was "more akin to that of an employee than that of a 'client, patron, or customer' § 51 was designed to protect." *Johnson*, 534 F.3d at 1126 (citing *Strother*, 79 F.3d at 863); *see also Gauvin v. Trombatore*, 682 F. Supp. 1067, 1073 (N.D. Cal. 1988) (Unruh Act does not apply to discrimination in employment "regardless of whether the relationship between the parties is characterized as employer-employee or contractor-subcontractor").

Because the undisputed facts show that Plaintiff's relationship with Jetyd is not the type of relationship protected under the Unruh Act, Defendants are entitled to summary judgment as to Plaintiff's third cause of action for race discrimination under the Unruh Act.

**D.** **Violation of 42 U.S.C. § 1981**

Under 42 U.S.C. § 1981(a), "all persons" are guaranteed the right to "make and enforce contracts." "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 126 S. Ct. 1246, 163 L. Ed. 2d 1069 (2006).

To prove a Section 1981 claim, a plaintiff must meet the same standard as is required under Title VII of the Civil Rights Act. *Manatt v. Bank of Am.*, 339 F.3d 792, 797 (9th Cir. 2003). Under that standard, Plaintiff must offer proof of: (1) membership

in a protected class; (2) that he performed his job satisfactorily; (3) that he suffered an adverse employment action; and (4) that Defendants treated Plaintiff differently than a "similarly situated employee who does not belong to the same protected class as" Plaintiff. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Establishing this *prima facie* case creates a presumption of race discrimination, which Defendants can rebut by showing that they took the allegedly adverse action for a "legitimate, nondiscriminatory reason." *Id.* Plaintiff may then defeat this showing by offering proof that the nondiscriminatory reason was "actually a pretext for racial discrimination." *Id.* "[S]ummary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race." *Id.*

First, as to UNEX, Plaintiff adduces no evidence to show that UNEX was involved in the Agreement, Plaintiff's distribution of Jetyd's products, or the decision not to renew his contract. Rather, UNEX's only alleged involvement is Plaintiff's claim that he was paid by UNEX. (Rashad Decl. ¶ 11.) Even if UNEX was responsible for Plaintiff's payments, there are no facts to show that UNEX had any discretion over this payment or any discriminatory intent toward Plaintiff. Thus, even construing the facts in the light most favorable to Plaintiff, no triable issue exists as to UNEX's liability under 42 U.S.C. § 1981. Accordingly, summary judgment is **GRANTED** as to Plaintiff's claim under Section 1981 against UNEX.

As to Jetyd, Plaintiff offers proof that Kovacs, who Plaintiff asserts was President of Jetyd, approved Plaintiff's hire for the sole purpose of obtaining Plaintiff's contacts and never intended to keep Plaintiff on as a distributor because of his race. (*See* Sement Decl. ¶¶ 6, 18.) Kovacs allegedly referred to African-Americans generally and Plaintiff specifically with racial epithets. (*Id.* ¶ 17; Grover Decl. ¶¶ 8, 11.) In addition, Junkers allegedly told Fuqua that Plaintiff did not fit the company's "image" and therefore his

contract could not be renewed. (Rashad Decl. ¶ 35.) Defendants dispute these facts and put forth evidence that Kovacs was not affiliated with Jetyd during the relevant period and that Plaintiff's contract was not renewed due to his failure to achieve sales. Even if Kovacs was not officially the President of Jetyd during the relevant period, however, his alleged comments create a triable issue as to the discriminatory motives of Jetyd's decision-makers to the extent he had access to and interacted with them during the relevant period. Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that a triable issue exists as to whether Jetyd terminated its relationship with Plaintiff on the basis of race.[10]

## V.

## CONCLUSION

In light of the foregoing, the Court orders the following:

(1)     Summary Judgment is **GRANTED** in its entirety as to Defendant UNEX;

(2)     Summary Judgment is **GRANTED** as to Plaintiff's Claim under the Unruh Act against Jetyd; and

(3)     Summary Judgment is **DENIED** in all other respects;

(4)     The deadline to conduct discovery as to Sement and Grover is extended to October 4, 2013; and

---

[10] Defendants also argue that Plaintiff was terminated for a legitimate, non-discriminatory reason, namely, that he had failed to perform as a distributor. This argument turns on whether Plaintiff was entitled to a commission on the San Onofre Project sale, which in turn depends on the breadth of Plaintiff's territory under the Agreement. Although the parties agree that the territory is written as "L.A.," they do not agree on the meaning of that term. The Court finds that the term "L.A." is indeed ambiguous, and therefore statements by Fuqua and others that Plaintiff's territory included the San Onofre Plant are admissible to explain the meaning of that term. *See Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37, 69 Cal. Rptr. 561 (1968) (extrinsic evidence is admissible if it is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible"). Thus, just as a material dispute exists as to Plaintiff's contract claim, a dispute exists as to whether Defendants had a legitimate, non-discriminatory reason for canceling the Agreement.

(5)    The deadline to file all pretrial documents referenced at paragraph 9 of the Court's Order regarding Stipulation Extending Pretrial Deadlines and Trial Date [Doc. # 17] is extended from October 8, 2013 to October 15, 2013. All other deadlines remain unchanged, and the parties shall comply with the requirements of the Case Management Order pertaining to the preparation of pretrial documents [Doc. # 10].


**IT IS SO ORDERED.**

DATED:    September 6, 2013

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE